UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF CHARLES CHIVRELL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ARCATA, et al.,<br><br>Defendants. | Case No. 22-cv-00019-HSG<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION AND GRANTING QUALIFIED IMMUNITY**<br><br>Re: Dkt. No. 92 |

This civil rights lawsuit arises from the fatal shooting of Charles Chivrell by law enforcement officers. The Plaintiffs in this case are the Estate of Charles Chivrell, Arielle Chivrell (Mr. Chivrell's surviving spouse), K.C. (Mr. Chivrell's biological son), and D.C. (Mr. Chivrell's biological daughter) (collectively, "Plaintiffs"). They have sued the City of Arcata, the Arcata Police Department, Brian Ahearn, Brian Hoffman, Joseph Rodes, Evan Beechel, the State of California, California Highway Patrol, Michael Griffin, Moises Cornejo-Mercado, and unnamed Doe Defendants (collectively, "Defendants") for alleged violations stemming from this fatal encounter.

Plaintiffs have moved for summary adjudication, and Defendant Sergeant Hoffman responds by seeking a finding that he is entitled to qualified immunity.[1] The Court held a hearing

---

[1] Plaintiffs' motion for summary adjudication focuses solely on the reasonableness of Defendant Hoffman's use of non-lethal force (i.e., firing pepperballs at Mr. Chivrell as described below). The confrontation between officers and Mr. Chivrell ultimately resulted in the use of lethal force: when Mr. Chivrell fired at the officers after being hit by several pepperballs, Officer Griffin responded by fatally shooting him. Plaintiffs do not dispute that lethal force was warranted after Mr. Chivrell fired at the officers. *See* Dkt. No. 114 (hearing transcript) at 6:13–17 (acknowledging "that if you were just to look at the latter stage where Mr. Chivrell ducks, is hit again, then turns around and pulls his weapon and points it[,] at that point we concede that they are justified in shooting him"). But on a level deeper than any doctrinal dispute, this case involves an undeniable human tragedy: a son, husband and father is gone forever, with unfathomable

on the motion. *See* Dkt. No. 112. For the reasons below, the Court DENIES Plaintiffs' motion and finds that Defendant Hoffman is entitled to qualified immunity.

## I.  BACKGROUND

### A.  CHP and APD Encounter Mr. Chivrell[2]

On September 9, 2021, the California Highway Patrol ("CHP") dispatch center received a call reporting a suspect with a gun in the vicinity of Heindon and Miller Road in North Arcata, California. Dkt. No. 92-1 ("Merin Decl."), Ex. H at 22.[3] CHP officers Michael Griffin and Moises Cornejo-Mercado (in their patrol vehicle) located the suspect at around 10:45 a.m. and asked Arcata Police Department ("APD") to respond as backup. *Id.*, Ex. A at 5. Officers observed the suspect walking along Miller Road with a holstered firearm on his right hip and a jacket and briefcase in his left hand. *See id.* at 3; Ex. B at 02:45-02:50, 12:15-12:40. The suspect was later identified as Charles Chivrell.

---

consequences for the people who loved and were loved by him. So nothing in the Court's analysis of the legal questions presented on this motion is meant to minimize the stark and heartbreaking human toll that results when a person's life is cut short in a confrontation with the police.

[2] Both parties insist that there are no material disputes of fact because the relevant interaction was captured on video. *See* Dkt. No. 92 ("Mot.") at 15 ("There are no genuine issues of material fact, such that the reasonableness of the use of force is a pure question of law."); Dkt. No. 96 ("Opp.") at 1 ("The entire incident is captured on video. The City agrees with Plaintiffs that there are no material disputed facts."); Dkt. No. 98 ("Reply") at 1 ("City Defendants agree with Plaintiffs that there are no material disputed facts, where the entire incident was captured on video. Accordingly, because there are no genuine issues of material fact. . ., the reasonableness of the use of force is a pure question of law."). But the Court disagrees with these assertions, since both parties' own characterizations of the record reveal a number of factual differences. For example, Plaintiffs argue that "it is undisputed that Chivrell did not pose any threat when Hoffman shot pepperball projectiles at his back," *see* Mot. at 7, but Defendants actually contend that Chivrell "posed an immediate threat" to Sergeant Hoffman during this exchange, *see* Opp. at 8. Moreover, the video footage does not indisputably establish the material factual record given that there are several key parts of the audio that cannot be heard, and segments where the picture is unclear. *See* Merin Decl., Ex. H at 28. As one example, an investigation report (Dkt. No. 92-1 at 29) reflects that Chivrell made relevant statements not included in Plaintiffs' statement of facts. Accordingly, this fact section only lists the facts in the case that truly appear to be undisputed, unless otherwise noted. In assessing whether Sergeant Hoffman is entitled to qualified immunity, the Court must view this factual record in the light most favorable to Plaintiffs as the non-moving party. *See Tolan v. Cotton*, 572 U.S. 660, 657 (2014) (in determining whether defendant is entitled to qualified immunity, court must resolve factual disputes in favor of non-moving party). But when assessing Plaintiffs' motion for summary adjudication, the Court conversely must view the facts in the light most favorable to Defendant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

[3] For ease of reference, the page numbers are cited according to the ECF pagination.

Officer Cornejo-Mercado slowly drove behind Chivrell as he walked down Miller Road. Officer Cornejo-Mercado stopped his patrol vehicle approximately sixty feet from Chivrell while Officer Griffin, who was in the passenger seat, used the public address (PA) system to get Chivrell's attention. Officer Griffin told Chivrell to stop walking, drop what he was carrying, and put his hands up. Merin Decl., Ex. H at 28. Chivrell dropped what he was carrying and put his hands behind his head. *Id.* Officer Griffin told Chivrell to face away, to which Chivrell responded, "I'm gonna keep going." *Id.* He then picked up his belongings and proceeded to walk away from the officers. *Id.* Officer Griffin had "put him at gunpoint right away" drawing both his department issued pistol and patrol rifle during the interaction. *Id.*

Officer Griffin observed Chivrell acting erratically. *Id.* at 30. Chivrell responded, "you're gonna shoot me," and "just shoot me." *Id.* at 29. Officer Griffin replied, "I'm not gonna shoot you, I don't wanna shoot you," and told Chivrell repeatedly to "stop walking . . . we just want to talk to you." *Id.* Chivrell told Officer Griffin to stop pointing his gun at him, and Officer Griffin lowered his rifle and displayed his hands, saying "OK. That's a deal. I'm showing you my hands. You show me yours. We can just figure this out." *Id.* at 31. Chivrell turned onto Mad River Road, a four-mile-long dead-end roadway with no sidewalks, in a rural area containing approximately twenty houses. Dkt. No. 96-1 ("Hoffman Decl.") at ¶ 5. Officer Cornejo-Mercado continued to follow Chivrell in the patrol vehicle and "ke[pt] distance." Merin Decl., Ex. H at 28. Officer Griffin continued to speak to him, without using the PA system, saying things like "I just need to talk to you," and "we need to figure this out." *Id.* at 28–29. When Officer Cornejo-Mercado used the PA to give commands, Chivrell did not comply. *Id.* at 29.

At this point, three APD Officers, Joseph Rodes, Evan Beechel, and Alexander Bonaparte, arrived on the scene and joined CHP to form a law enforcement caravan. Merin Decl., Ex. C at ¶ 4. The caravan continued to follow Chivrell. *Id.* As multiple patrol cars were following Chivrell, a few cars passed by in the opposite direction, traveling eastbound on Miller Lane. *Id.*, Ex. H at 28. Chivrell continued to walk away from the officers but made a quick movement when cars drove past in the opposite lane. Officer Griffin warned him "Don't be doing that," and Chivrell turned toward Officer Griffin, yelled "AAAHHHHHH," and simulated a "cowboy draw,"

3

acting as if he was drawing a pistol.  Officer Griffin told him not to "be stupid." *Id.* at 29. Chivrell yelled back several comments about his "Second Amendment right," to which Officer Griffin responded "hey, let us just talk to you. You've got the right to bear arms. I agree, okay?" *Id.,* Ex. F at 3:50–3:55.  Chivrell responded, "yeah, I've got the right to travel too," and "you don't have the right to talk to me." *Id.* at 3:55–3:58. Officer Griffin responded that he did have the right to talk to Chivrell, and asked "can we just cooperate?" *Id.* at 3:58–4:08.  Chivrell continued to walk away from the officers.  He said "I'm going to McKinleyville.  Meet me there, okay?" Griffin responded, "That ain't going to happen man." *Id.* at 4:23–4:25.

      Chivrell continued to walk down Mad River Road in the direction of Hammond Trail Bridge, a pedestrian footbridge connecting Mad River Road to McKinleyville.  Merin Decl., Ex. H at 39.  Chivrell neared two vehicles traveling in the opposite direction that had pulled to the side. Chivrell was ranting and moving around but walked past the vehicles as they drove by without incident.  *See id*. at 30.

      Officer Griffin remained outside the vehicle during most of the interaction, positioned in the "V" of the passenger door and jogging to keep pace with it.  Merin Decl., Ex. H at 30.  Officer Griffin asked APD officers on the scene about a SWAT response and an APD officer told him that their sergeant was on his way with a pepper-ball launcher.  *Id.*  A bicyclist rode by Chivrell and the police caravan, and while Chivrell did not interact with the cyclist, Officer Griffin expressed concern for public safety because Chivrell was "non-compliant," "acting erratically," and "armed with a gun."  *Id.*   Defendant Sergeant Hoffman arrived on the scene at this point in the encounter. *Id.*, Ex. A at 3.

### B.  Sergeant Hoffman's Use of Force

     Sergeant Hoffman observed Chivrell about twenty yards in front of the caravan. Merin Decl., Ex. A at 3.  Sergeant Hoffman did not directly hear Chivrell make any threats but observed that he was possibly "under the influence of a stimulant or having a mental health issue." *Id.* at 7.  Sergeant Hoffman spoke with APD Officer Joseph Rodes about the situation:

      Rodes: "He's got a pistol on his hip, in a holster." Merin Decl., Ex. C
        at 10:30–10:36.

4

1  Hoffman: "Has he brought it out yet?" *Id*. at 10:36–10:38.
2  Rodes: "Nope. It's just in the holster." *Id*. at 10:38–10:40.
3  Hoffman: "What's he saying?" *Id*. at 10:40–10:41.
4  Rodes: "You know, it's his right to bear arms. A lot of stuff like that. He hasn't made
5  any violent gestures, or anything like that. But he's obviously refused to stop and talk
6  to us, multiple times." *Id*. at 10:41–10:50.
7  Hoffman: "Guys, we're going to roll up. Get close enough. Make sure we got lethal
8  coverage. I'm just going to unload on him." *Id.*, Ex. D at 14:30–14:38.

Sergeant Hoffman jogged alongside the caravan for about 200 yards before he reached the head patrol vehicle driven by Officer Cornejo-Mercado. Merin Decl., Ex. E at 00:13–00:18. Officer Griffin got in the backseat of the patrol car and Sergeant Hoffman got in the passenger seat. *Id.* Sergeant Hoffman instructed Officer Cornejo-Mercado to "scoot up about ten more feet" so that he could just "start firing." *Id.* Sergeant Hoffman got out of the car and stood in the "V" of the patrol vehicle passenger door. *Id*. Sergeant Hoffman targeted Chivrell's back as he was walking away from the officers. *Id.* Sergeant Hoffman provided no warning to Chivrell before firing seven shots from the pepperball launcher. *Id*., Ex. A at 6. The pepperball projectiles hit Chivrell in the legs and back and a small cloud of PAVA[4] powder was visible. *Id*., Ex. H at 11. Officer Griffin observed that Chivrell got hit with the pepperballs, "jumped," and reached down and "raised" the pistol from out of the holster. *Id.* at 31. Sergeant Hoffman heard an officer yell "He draw? He drew!" and saw Chivrell raising his right arm and turning towards the officers. *Id*., Ex. A at 8; *Id.,* Ex. F at 18:00–18:11. Sergeant Hoffman heard a gunshot and felt something, which he believed to be a bullet, whizz past his head. Chivrell fired his pistol approximately five seconds after the first pepperball projectile was shot. Merin Decl., Ex. A at 8. As Chivrell was lifting his pistol, Officer Griffin "squeezed one round off" and Chivrell "immediately went down."

---

[4] PAVA (capsaicin II) is the Oleoresin Capsicum powder in pepperball rounds and pepper spray which "is designed to cause intense pain, and inflicts a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx, as well as disorientation, anxiety, and panic." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2001) (internal citations omitted).

*Id.*, Ex. H at 31.  Mr. Chivrell died at the scene from a fatal head wound.  *Id.*, Ex. A at 8.

## II. STANDARD OF REVIEW

Summary judgment is proper when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88.

## III. DISCUSSION

Plaintiffs move for summary adjudication solely as to Sergeant Hoffman's conduct in firing pepperball projectiles at Mr. Chivrell, arguing that this use of force was excessive under the Fourth Amendment.[5]  In addition to contesting the merits of the constitutional claim, Sergeant Hoffman raises qualified immunity as an affirmative defense.  *See* Dkt. No. 96 ("Opp.") at 16.  After a hearing, the Court ordered both parties to submit supplemental briefs "identifying and discussing the cases the parties contend either did or did not clearly establish at the time of the incident that Officer Hoffman[']s actions were unconstitutional, under the qualified immunity standards articulated by the Supreme Court."  Dkt. No. 112.

The Court will first address whether Sergeant Hoffman is entitled to qualified immunity, then consider the merits of Plaintiffs' motion for summary adjudication as to other Defendants and claims not subject to a qualified immunity defense.  Dkt. No. 115 at 9.

---

[5] Pepperball projectiles are non-trivial force.  The Ninth Circuit has "previously rejected the contention that the use of pepper spray is a minimal intrusion, due to the immediacy and uncontrollable nature of the pain involved.  *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) (internal quotations and citations omitted).  Rather, a pepperball projectile "combine[s] the shock of kinetic impact (similar to paintballs) with the sensory discomfort associated with pepper spray," *Nelson v. City of Davis*, 709 F.Supp.2d 978, 982 (E.D. Cal. 2010).  Pepperball projectiles therefore "combine two types of force that [the Ninth Circuit] ha[s] already recognized as unreasonable when aimed at individuals who pose no threat and have committed, at most, minor offenses."  *Nelson*, 685 F.3d at 884.

### A.   Request for Finding of Qualified Immunity

#### i.   Legal Standard

The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is supposed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In theory, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted).  To determine if an officer is entitled to qualified immunity, the Court considers whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Courts may choose which prong to address first. *Id.* at 236.  Under either prong, though, the Court may not resolve genuine disputes of fact in favor of the party seeking summary judgment on qualified immunity grounds, and must, as in other cases, view the evidence in the light most favorable to the nonmovant. *Tolan*, 572 U.S. at 656.

Under the second prong of the qualified immunity inquiry, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it.'" *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).  While this does not "require a case directly on point, [ ] existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* at 742.  The Supreme Court has further instructed that, where "the result depends very much on the facts of each case . . . officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Nicholson v. City of L.A.*, 935 F.3d 685, 695 (9th Cir. 2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); *see also D.C. v. Wesby*, 583 U.S. 48, 64 (2018) ("[W]e have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth

Amendment." (quotations omitted)).  Put another way, "[i]t is insufficient for a legal principle to merely be 'suggested by then-existing precedent.'" *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *Wesby*, 583 U.S. at 63).  Instead, "'[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.  See also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'").  "Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018) (quoting *Mullenix*, 577 U.S. at 12).  The Ninth Circuit "routinely rel[ies] on the intersection of multiple cases when holding that a constitutional right has been clearly established," on the ground that "[t]his approach is required by the Supreme Court's instruction that qualified immunity is improper where a legal principle has a sufficiently clear foundation in then-existing precedent." *Polanco v. Diaz*, 76 F.4th 918, 930 n.8 (9th Cir. 2023) (cleaned up).

      **ii.**    **Analysis**

The Court begins with the second prong of the qualified immunity analysis: whether Sergeant Hoffman violated a clearly established right when he used non-lethal force (in the form of pepperball projectiles) on an armed man who was acting erratically and refusing to comply with directions given by law enforcement officers for an extended period of time in a public and non-contained area, when without dispute "Hoffman likely had authority to stop and question Chivrell based on reasonable suspicion that he committed a crime . . . ."  Dkt. No. 92 ("Mot.") at 12.  Plaintiffs argue that "the intersection of multiple cases, including those involving uses of projectiles against non-threatening and mentally ill subjects who have committed only minor offenses, clearly established that Hoffman's shooting pepperball projectiles at Chivrell's back as he walked away from the officers was a violation of the Fourth Amendment at the time it occurred."  Dkt. No. 115 ("P. Supp. Br.") at 3.  In their argument in the reply regarding clearly established law, Plaintiffs primarily rely on *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001),

8

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), and *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019). Dkt. No. 98 ("Reply") at 9. Then in the supplemental brief, Plaintiffs discuss a substantially larger number of cases. P. Supp. Br. at 2–9.[6]

Plaintiffs rely particularly heavily on *Deorle* for the proposition that Sergeant Hoffman violated clearly established law by firing, without warning, pepperball rounds at an apparently mentally ill individual posing no threat.[7] *See* P. Supp Br. at 3. In *Deorle*, the Ninth Circuit held that it was unconstitutional to shoot an emotionally distressed and uncooperative man with a lead-filled "beanbag round" once he reached a predetermined point on his own property. *Deorle*, 272 F.3d at 1278. The court held that "[e]very police officer should know that it is objectively unreasonable to shoot–even with [less-lethal rounds]–an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285.

The Court finds that *Deorle* does not clearly establish that Sergeant Hoffman's actions here

---

[6] Plaintiffs' supplemental brief cites nearly fifty cases purporting to describe what was "clearly established" at the time of the challenged use of force with respect to the individual *Graham* factors. This approach is telling in itself: even accepting that the Ninth Circuit has recognized that clearly established law may be discernible from the intersection of the holdings in different cases, this Court is unaware of any case from that or any other court that based a finding of clearly established law on anywhere near this large a number of cases. *See, e.g., Polanco*, 76 F.4th at 930 (finding that unlawfulness of defendant's alleged actions was clearly established by the combination of two precedents). This is unsurprising given the Supreme Court's directive that the precedent must place unconstitutionality "beyond debate" for any reasonable officer: if a court has to piece together scores of decisions to discern what was clearly established, it is unlikely that the governing legal principle was indisputably clear. Plaintiffs compound the challenge by relying on a large number of cases involving lethal force—specifically, police shootings—which by definition are of limited if any value in defining clearly established principles governing the use of non-lethal or less-lethal force. For all of these reasons, the Court will focus on the six cases Plaintiffs identify that involved non-lethal or less-lethal force: *Deorle*, *Nelson*, *Glenn*, *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), *Silva v. Chung*, 740 F.App'x 883 (9th Cir. 2018), and *Vazquez v. Cnty. of Kern*, 949 F.3d 1153 (9th Cir. 2020). As discussed below, the Court finds that neither these cases (or their intersection) nor any other cases of which the Court is aware satisfy the requirements for overcoming qualified immunity here.

[7] The Court notes that on more than one occasion the Supreme Court has "instructed the [Ninth Circuit] not to read its decision in [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law." *Kisela*, 584 U.S. at 106 (citing *Sheehan*, 575 U.S. at 614–616).

were unconstitutional.  In *Kisela*, the Supreme Court explained that *Deorle* involved "a police officer who shot an unarmed man in the face without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly forty minutes."  584 U.S. at 106–107.  Moreover, in *Deorle* the police had established roadblocks preventing the suspect from leaving his own property, and he was not attempting to flee or escape.  272 F.3d at 1281–82.

        This case differs in several key respects from *Deorle*.  First, and critically, here Chivrell was armed with a handgun (which a caller had reported to the police), had consistently refused to comply with officers' directions to stop, and was walking down a public road on which he passed several cars and at least one bicyclist.  Plaintiffs do not dispute that under the circumstances the law enforcement officers were justified in stopping Chivrell to determine whether he was violating California law making it at least a misdemeanor to carry a loaded firearm in a public place.  *See* Cal. Penal Code § 25850(a) and (b) (explaining that "[i]n order to determine whether or not a firearm is loaded for the purpose of enforcing this section, peace officers are authorized to examine any firearm" so carried).  Under these circumstances confronting the officers, especially the fact that Chivrell was armed with a firearm, acting erratically and refusing to comply with directions, *Deorle* did not clearly establish that it would be unconstitutional for Sergeant Hoffman to use a pepperball launcher to attempt to gain compliance so the officers could investigate whether Chivrell's public possession of the firearm was unlawful.

        Plaintiffs cite three other cases that involved the use of force against apparently mentally ill individuals and relied on *Deorle* to hold that such force was unconstitutional—*Glenn*, *Bryan*, and *Silva*.  But like *Deorle*, the facts of all three cases materially differ from those here, and thus fail to clearly establish that Sergeant Hoffman's use of the pepperball launcher was unconstitutional.  Starting with *Glenn*, as a threshold matter, the *Glenn* court did not make a final determination as to whether the force there was excessive, instead sending the issue back to the trial court for resolution by a jury.  *Glenn*, 673 F.3d at 879.  In holding that the lower court erred in granting summary judgment as to the constitutionality of the officers' use of force, the court determined

that material questions of fact "preclude[d] a conclusion that the officers' rapid resort to deadly force was reasonable as a matter of law," but also opined that the disputed facts "could support a verdict for either party." *Id.* at 879–880. The Court questions whether an opinion holding that a jury *could* find a use of force excessive could ever amount to "clearly established law." But even if it could, the key facts of *Glenn* are too dissimilar to the facts here to establish a legal principle that would put the illegality of Sergeant Hoffman's actions "beyond debate." *Glenn* involved officers shooting a beanbag gun at an emotionally disturbed individual holding a knife to his own throat at his family home. 673 F.3d at 878. Significantly, as in *Deorle*, the *Glenn* court determined that the individual was not an immediate threat of harm to anyone because he was not wielding the knife close to the officers or anyone else. *Id.* at 874. In addition, despite the individual's failure to comply with all the officers' commands, the court held that he was not actively resisting or fleeing because he stayed in the same physical position throughout the encounter with police. *Id.* at 875. This scene markedly contrasts with the one Sergeant Hoffman encountered, considering Chivrell's possession of a gun, his erratic movements away from and interactions with the officers, and his proximity to members of the public.

*Bryan v. MacPherson* is distinguishable for similar reasons. In *Bryan*, the Ninth Circuit held that police used unconstitutionally excessive force when tasing an unarmed man who was acting agitated and upset during a routine traffic stop, but complied with police commands, never attempted to flee, and never posed "an immediate threat" to others. 630 F.3d at 832. Plaintiffs cite *Bryan* for several "clearly established propositions": (1) exhibiting bizarre behavior such as shouting does not amount to active resistance, (2) the force used in providing assistance to a person suffering a mental health crisis "'necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community,'" and (3) Sergeant Hoffman should have given a warning before using the pepperball launcher. P. Supp. Br. at 6 (quoting *Bryan*, 630 F.3d at 839). As with the above cases, important factual differences between *Bryan* and the facts here preclude any of these overly generalized principles from constituting "clearly established law" that any reasonable officer in Sergeant Hoffman's position would have known to apply. First, the court's holding that Bryan's

11

disturbed and upset behavior on its own did not amount to active resistance against the officer, *see Bryan*, 630 F.3d. at 830, says nothing about the nature of similar behavior when it is exhibited by an armed individual defying commands and continually moving away from officers over a significant period of time.  Second, in rejecting the officer's argument that the victim's perceived mental illness alone justified the officer's use of the taser, the court clarified that standards for permissible force differ when officers are "providing assistance to a person in need of psychiatric care" versus using force against "a person who has committed a crime or who poses a threat to the community." *Id.* at 828.  No one is arguing that Chivrell's mental state alone justified Sergeant Hoffman's use of the pepperball launcher.  In any case, the court's clarification in *Bryan* undermines Plaintiffs' arguments here, as Chivrell's possession of a gun, his refusal to comply with police commands, and his proximity to the public did increase the risk that he posed "a threat to the community," unlike the unarmed individual in *Bryan*.  Finally, the Court does find that Sergeant Hoffman very likely should have given a warning under controlling law before shooting Chivrell in the back with pepperballs.  *See Deorle*, 272 F.3d at 1284 (declining to hold that warnings are required whenever less than deadly force is employed, but stressing that "such warnings should be given, when feasible, if the use of force may result in serious injury," and finding that there "the desirability and feasibility of a warning [were] obvious").  But viewing the totality of the circumstances facing the officers here, the Court cannot conclude that the case clearly established that firing the pepperballs without giving a warning was in itself unconstitutional.  *See Bryan,* 630 F.3d. at 831 (officer's failure to warn before using force is "by no means dispositive" of a constitutional violation).

The remaining case involving a mentally disturbed individual, *Silva v. Chung*, also does not define a clearly established right that any reasonable officer in Sergeant Hoffman's position must have understood he was violating.  The Court first notes that it is unclear whether an unpublished memorandum disposition can ever constitute "clearly established law" given that, by definition, it is not precedent.  Moreover, *Silva* presents similarly inapposite facts.  In *Silva*, an officer used unconstitutional force when he tasered and pepper-sprayed a man for walking in the middle of the street when the man was unarmed and traffic was stopped.  740 F. App'x at 886.

12

Plaintiffs assert *Silva* establishes that walking in the road is not a "serious crime," and that walking away from police does not amount to "actively attempting to evade arrest." P. Supp. Br. at 7. Neither principle has much bearing on the facts here. The court held that the individual walking in the road in *Silva* "never posed even a potential threat" because he did so while unarmed and away from the public, 740 F. App'x at 886, whereas Chivrell was armed with a gun near active traffic. And the individual was not actively attempting to evade arrest by simply walking away from police because he was "disobeying a police officer's order *but otherwise pose[d] no threat to the officer or others*." *Id.* at 887 (quotation omitted, emphasis added). But here, the person defying police orders and moving away from them was armed, and members of the public were potentially at risk. As such, even if the holding of *Silva* is could constitute clearly established law, its facts are too dissimilar to "squarely gover[n]" Sergeant Hoffman's use of the pepperball launcher against Chivrell. *See Nicholson*, 935 F.3d at 695.

*Nelson v. City of Davis* also did not clearly establish that Sergeant Hoffman's actions were unlawful. Plaintiffs argue that *Nelson* clearly established that Sergeant Hoffman's use of intermediate force on Chivrell while he was engaged in "passive resistance" violated the Fourth Amendment. P. Supp. Br. at 5–6. In *Nelson,* officers fired pepperballs at a group of partying college students who failed to disperse from an area after being instructed to do so. 685 F.3d at 872. Plaintiffs rely on the Ninth Circuit's holdings that "a reasonable officer would have known that firing projectiles, including pepperballs, in the direction of individuals suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance, was unreasonable." *Id.* at 885–86.

*Nelson* bears little resemblance to this case. While *Nelson* held that "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force," *id.* at 881, what matters is whether application of that principle to the facts of that case establishes "beyond debate" that Sergeant Hoffman's actions here were unlawful. Plainly, it doesn't. In *Nelson*, "there was no indication that Nelson or his colleagues (college students taking cover in the breezeway while awaiting further instructions from police) represented a threat to anyone's safety." 685 F.3d at 881. In

13

*Nelson* the police had an interest in removing trespassers with permission from the property owner, but "the desire to do so quickly, in the absence of any actual exigency, [could not] legitimize the application of force when it [was] not otherwise justified." *Id.* at 880. Chivrell's actions presented an obviously different and much more concerning risk: he was armed with a gun, was acting erratically, and was in an uncontained public area where he could (and did) encounter members of the public, in a manner that was difficult if not impossible for the officers to predict. Here too, the generic principle announced in addressing very different facts in *Nelson* does not meet the high threshold for overcoming qualified immunity.[8]

Finally, this is not the unusual circumstance in which the constitutional violation was so obvious as to be clear even absent a factually analogous case. The Ninth Circuit has recognized that "such cases are extraordinarily rare and especially problematic in the Fourth Amendment context." *Perez*, 98 F. 4th at 927 (quotations and internal citation omitted). Here, the facts that distinguish the cases on which Plaintiffs rely equally show that the obviousness exception to the specific case requirement does not apply here. Whether or not Sergeant Hoffman might have considered other courses of action in dealing with an armed, agitated, and noncompliant man on a public road, his choice to resort to use of the pepperball launcher was not clearly unlawful under

---

[8] Plaintiffs also cite to APD policy and training materials to argue that Sergeant Hoffman was on notice that his conduct was unlawful. P. Supp. Br. at 9. While the Supreme Court has at times looked to internal police training materials and policies, failure on the part of the officers to follow their training "does not itself negate qualified immunity where it would otherwise be warranted." *Sheehan*, 575 U.S. at 616. The Ninth Circuit has held the same. *See Perez*, 98 F.4th at 928 (holding that Supreme Court precedent "does not establish that any violation of police policy or guidance is, in and of itself, sufficient to deny qualified immunity"); *Vazquez,* 949 F.3d at 1164–65 ("Training materials and regulations are also relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable"). Here, Plaintiffs argue that Sergeant Hoffman violated APD pepperball training and policies. P. Supp. Br. at 9. Relevant policies include directives to "not intentionally target [the head, neck, spine or groin], except when the suspect poses an imminent threat of serious bodily injury or death to the officers or others," and to "give warnings prior to deployment." Mot. at 16–19. According to Plaintiffs, Sergeant Hoffman failed to provide a warning before firing and intentionally targeted Chivrell's back. *Id. at 8.* However, given that there is no binding caselaw to fairly put Sergeant Hoffman on notice that using non-lethal force in this situation was unreasonable, the APD policies alone are not enough to do so. *See Perez*, 98 F.4th at 928 (contravention of training would not defeat qualified immunity because "the law did not clearly establish, nor did the context of [the] case make it obvious," that officers' use of force was unlawful). *Cf. Vazquez*, 949 F.3d at 1165–67 (quotation omitted) (court considered training, in addition to "clearly established case law," in making "obvious" determination that sexual abuse of juvenile inmate by corrections officer was unconstitutional).

14

the controlling standards.

Accordingly, the Court finds that Sergeant Hoffman is entitled to qualified immunity.

### B.     Motion for Summary Adjudication

Plaintiffs argue that even if the Court finds that Sergeant Hoffman is entitled to qualified immunity, the "Court must still resolve the underlying issue of whether Hoffman's conduct violated Chivrell's Fourth Amendment rights" because Plaintiffs' remaining claims are not resolved by the Court's qualified immunity determination. P. Supp. Br. at 10. Plaintiffs' remaining claims include Section 1983 claims against the City, APD, and Chief Ahearn; disability-related claims against the City and APD; and state law claims against the City, APD, Chief Ahearn, and Sergeant Hoffman. *See id.* In contrast to the qualified immunity inquiry, because Plaintiffs seek summary adjudication, the Court must view all inferences reasonably drawn from the material in the record in the light most favorable to the nonmoving parties, in this case, Defendants.[9] *Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88.

Plaintiffs' excessive force claim is brought under 42 U.S.C. § 1983. *See* FAC ¶ 114. Plaintiffs allege that Sergeant Hoffman used excessive force in violation of the Fourth Amendment's protection against unreasonable seizures when he shot Chivrell in the back with pepperball projectiles. *See* Mot. at 5. Plaintiffs contend that they are entitled to summary adjudication on this claim because there was not a sufficient legitimate governmental interest to justify Sergeant Hoffman's use of force. *See id*. at 15. In the Court's view, a reasonable jury could disagree.

In evaluating a Fourth Amendment claim of excessive force, courts ask whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). To answer that question,

---

[9] Plaintiffs agree. *See* Mot. at 1, n.1 ("The relevant facts are recounted in the light most favorable to Brian Hoffman, as the non-moving party, based on the "information known to the officer at the time the conduct occurred."). Since addressing Plaintiffs' motion for summary adjudication requires the Court to view the factual record in a light most favorable to Defendants, this section of the order includes additional facts that are omitted from the general factual background that only contains undisputed facts in Section I of this order. These additional facts are appropriately viewed in the light most favorable to Defendants.

courts in this circuit consider: (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted; (2) the government's interest in the use of force; and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc). Courts judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. The Ninth Circuit has been clear that "summary judgment should be granted sparingly in excessive force cases." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (citing *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97. Accordingly, there is not "a magical on/off switch that triggers rigid preconditions" for the use of force. *Scott v. Harris,* 550 U.S. 372, 382 (2007).

All force (lethal and non-lethal) must be justified by the need for the specific level of force employed. *Bryan*, 630 F.3d at 825. So the Court begins with the first *Graham* factor and analyzes the type and amount of force that Sergeant Hoffman used against Chivrell. *Lowry*, 858 F.3d at 1256. This is a "highly fact-intensive task for which there are no per se rules." *Id.*

The Court finds that Sergeant Hoffman's shooting of pepperballs was the kind of use of intermediate force that can intrude on Fourth Amendment rights. Relying on *Nelson*, Defendants acknowledge the intrusive nature of pepperballs. *See* Opp. at 9 (quoting *Nelson*, 685 F.3d at 873, and noting that pepperball projectiles have an effect similar to mace or pepper spray in that they combine the kinetic impact of a projectile with the sensory discomfort of pepper spray). In *Nelson*, the Ninth Circuit determined that this intrusion is significant because it "encompass[es] both the physical blow from the force of the projectile and the chemical effects of pepper spray." 685 F.3d at 878. The Ninth Circuit has also "previously rejected the contention that the use of pepper spray is a 'minimal' intrusion, due to the immediacy and "uncontrollable nature" of the

16

pain involved." *Id*. (quoting *Headwaters Forest Def. v. Cnty. of Humboldt ("Headwaters I")*, 240 F.3d 1185, 1199 (9th Cir.2000), *vacated and remanded on other grounds,* 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001)). Without dispute, Chivrell was struck by pepperballs projectiles shot at his back by Sergeant Hoffman, including on his legs and back. Merin Decl. Ex. A at 4.

The second step is to evaluate the government's interest in the use of force. *Lowry*, 858 F.3d at 1257. That interest is assessed by considering: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Graham*, 490 U.S. at 396). It is in this context that Plaintiffs argue Sergeant Hoffman's actions were unreasonable as a matter of law. *See* Mot. at 6. But there are genuine factual disputes here such that, taking all inferences in the Defendants' favor, a reasonable jury could find the force used was justified under the circumstances. Accordingly, the Court may not grant summary adjudication. *See Lowry*, 858 F.3d at 1254 (holding that only "in the absence of material factual disputes" is reasonableness of force "a pure question of law") (internal citation and quotations omitted). Defendants join Plaintiffs in asserting that there are "no material disputed facts" because "the entire incident is captured on video." (Opp. at 1.) The existence of video footage alone, however, does not compel the Court to decide the issue of reasonableness of force on summary adjudication, as there may still be triable issues of fact even when video evidence exists. *See Sanderlin v. Dwyer*, No. 23-15480, slip op. at 18 (9th Cir. Sept. 4, 2024) (affirming denial of summary judgment on excessive force claim because the trial court found the reasonableness of the force used "turn[ed] on how the jury interpret[ed] the video footage, and whether the jury credit[ed] [the officer's] testimony"); *see also Rayzberg v. Cnty. of Los Angeles*, No. NO. CV 23-2585-DMG (JCX), 2024 WL 3055474, at *6 (C.D. Cal. May 8, 2024), *reconsideration denied sub nom. Rayzberg v. Cnty. Los Angeles*, No. CV 23-2585-DMG (JCX), 2024 WL 3468932 (C.D. Cal. June 20, 2024) (denying summary judgment on excessive force claim based on handcuffing of plaintiff because a "genuine dispute of material fact as to the tightness of her handcuffs" existed, even where there was a video recording of the incident). Similarly, here, "disputed facts and inferences could support a verdict for either party,"

17

notwithstanding the video evidence.  *See Glenn*, 673 F.3d at 878.

For example, as to the severity of the crime at issue, while Plaintiffs argue that "Hoffman had no information about whether Chivrell was permitted to carry the firearm," Mot. at 6, Defendants contend that they had sufficient cause to believe that Chivrell unlawfully possessed a firearm in a public place (a violation of Penal Code §§ 25850(a) and 25400(a)(2)) because he matched the description of a report of an armed man acting suspiciously and was refusing to comply with officers' commands.  *See* Opp. at 6–7.  This dispute is materially relevant to whether Defendants had a reasonable suspicion that criminal activity might be occurring and were entitled to conduct an investigative stop.  *See Terry v.* Ohio, 392 U.S. 1 (1968); *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002).

As another example, viewing the evidence in a light most favorable to Defendants, a reasonable jury could conclude that Chivrell did pose an immediate threat to officers' and public safety.  Chivrell reportedly responded to officers with racially-derogatory comments, including "shut the fuck up you greasy Mexican," and "at least I got my papers you don't even have your papers."[10]  Merin Decl., Ex. H at 29.  Officers also report that Chivrell said he was attempting to go to McKinleyville to "take care of the Mexicans."  Merin Decl., Ex. H at 29.  According to Sergeant Hoffman, the footbridge near Mad River Road would have been accessible to Chivrell to access McKinleyville, but police vehicles would have been "too large to access or drive across the narrow pedestrian footbridge."  Hoffman Decl. at ¶¶ 6–7.  He maintains he had heard "that Mr. Chivrell was armed with a gun and not complying with commands," *id.* at ¶ 10, and deployed the pepperballs only after he learned about several failed attempts to get Chivrell to cooperate, as well as the exigency created by Chivrell's apparent plan to cross the footbridge.  While the evidence at trial may or more not ultimately confirm this account, viewing the record in the light most favorable to Defendants, the Court determines that a reasonable juror could find that Sergeant Hoffman had legitimate need to use pepperballs against Chivrell in order to protect the safety of

---

[10] This is one fact that the Court omitted from the general background facts in Section I of the order that it now appropriately considers when viewing the record in a light most favorable to Defendants.

18

the public and other officers.

Accordingly, the Court holds that Defendants have raised at least one triable issue of fact regarding the reasonableness of the force Sergeant Hoffman used on Chivrell. In making this ruling, the Court does not express any opinion as to the ultimate merits of this issue, and instead only finds that it cannot conclude on this record that Sergeant Hoffman clearly used excessive force in violation of the Fourth Amendment as a matter of law. Plaintiffs thus are not entitled to summary adjudication on this ground. *See Lowry*, 858 F.3d at 1254; *see also Glenn*, F.3d at 878 ("on summary judgment, the district court is not permitted to act as a factfinder"). Given that Plaintiffs' arguments with respect to all other claims hinge on a finding of a Fourth Amendment violation, *see* P. Supp. Br. at 9–10, summary adjudication as to those claims is accordingly also denied.

## IV. CONCLUSION

Plaintiffs' motion for summary adjudication, Dkt. No. 92, is **DENIED**. The Court further **SETS** case a case management conference on September 24, 2024, at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The parties are further **DIRECTED** to file a joint case management statement by September 17, 2024.

**IT IS SO ORDERED.**

Dated: 9/6/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge